IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Charles Cravatta,                              )
                                               )    Case No. 12 CV 50306
          Plaintiff,                           )
                                               )
 vs.                                           )
                                               )
Ed Lopez et al.,                               )    Judge Philip G. Reinhard
                                               )
          Defendants.                          )

## ORDER

For the following reasons, defendant Ed Lopez's motion for summary judgment [130] is granted.  Defendants City of Genoa and Todd Walker's motion for summary judgment [129] is granted in part and denied in part.  Officer Lopez's motion to bifurcate [160] is denied.  The parties are to discuss the possibility of a settlement conference with Magistrate Judge Iain Johnston at the next case management conference.  This case is set for a status hearing before this court on October 14, 2016 at 10:30 a.m.

## STATEMENT/OPINION

This matter arises out of plaintiff Charles Cravatta's thirteen-count first amended complaint against defendant Officer Ed Lopez, the City of Genoa, and Todd Walker, former mayor of Genoa.  *See* [46].  In the complaint, plaintiff alleges that while trying to walk his inebriated son-in-law home from a bar, he was stopped by Officer Lopez and another officer.  He claims that Officer Lopez used excessive force to strike him several times without provocation, falsely arrested him for domestic battery and aggravated assault against a police officer, and subjected him to malicious prosecution.  He also contends that Mayor Walker and Genoa retaliated against him after he filed his complaint in this court by requesting to the state's attorney's office prosecuting his criminal case not to dismiss his aggravated assault charge; plaintiff was ultimately acquitted after a jury trial.

Plaintiff alleges excessive force against Officer Lopez (Count I) along with related claims against Genoa under theories of indemnification (Count II) and the allegation that Officer Lopez's actions were willful and wanton (Count III).  Plaintiff also alleges battery against Officer Lopez (Count IV), and respondeat superior against Genoa (Count V).  Plaintiff alleges Monell liability against Genoa (Count VI), § 1983 liability against Genoa for failure to properly screen, train, monitor, or discipline officers (Count VII), and § 1983 liability against Genoa for failure to train officers regarding 5th Amendment privileges and *Miranda* rights (Count VIII).  Plaintiff also alleges against Officer Lopez claims of false arrest (Count IX) and malicious

1

prosecution (Count X). Plaintiff also alleges § 1983 retaliation and Monell liability against Mayor Walker and Genoa (Count XI). Finally, plaintiff seeks punitive damages against Officer Lopez (Count XII) and indemnification from Genoa for all defendants (Count XIII). Currently before the court are several motions for relief as set forth below.

On December 23, 2015, Officer Lopez filed a partial motion for summary judgment [130], memorandum in support [132], and Rule 56 statement of facts [131]. For purposes of his summary judgment motion, Officer Lopez challenged only Count IX, contending that the undisputed facts show that he is not liable to plaintiff for false arrest. Also on December 23, 2015, Genoa and Mayor Walker filed a joint motion for summary judgment [129], memorandum [137], and Rule 56 statement with attachments [134]; [135]; [136]. Their motion challenges Counts III, V, VI, VII, VIII, and XI.

On February 1, 2016, plaintiff filed a consolidated response to the various motions for summary judgment [145], as well as his consolidated Rule 56 response [146] and statement of additional facts [147]. On February 19, 2016, Officer Lopez filed his reply [151] and Rule 56 response [152]. Also on February 19, 2016, Genoa and Mayor Walker filed their joint reply [154] and Rule 56 response [153]. As explained above, the various motions challenge Counts III, V, VI, VII, VIII, IX, and XI. Counts I, II, IV, X, XII, and XIII have not been challenged for purposes of summary judgment and as such will not be discussed further here.

Also before the court is a motion to bifurcate the trial in this case. On March 7, 2016, Officer Lopez filed a motion to bifurcate [160]. On April 5, 2016, plaintiff filed a response [165]. On April 19, 2016, Officer Lopez filed a reply [171]. The foregoing matters are now ripe for the court's review.

On summary judgment, the court construes all facts and draws all inferences in the light most favorable to the non-moving party. *Schepers v. Commissioner, Indiana Dept. of Corrections,* 691 F.3d 909, 913 (7th Cir. 2012). The court does not weigh evidence or determine the credibility of witness testimony. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011). Instead, the court only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That said, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In evaluating the motions and the undisputed facts located in the parties' Local Rule 56.1 Statements of Material Fact with respect to each motion, the court is cognizant of its obligation to construe all disputed and undisputed facts in the light most favorable to the plaintiff. *See Schepers*, 691 F.3d at 913.

# I. FACTUAL BACKGROUND.

A. The relevant events.

On July 11, 2011, plaintiff and his family met for lunch in Chicago. [131] at ¶ 6. The family took the train back to Elgin and arrived at approximately 7:30 p.m. [131] at ¶ 7. Plaintiff then had dinner with his wife, daughter, and his son-in-law Marco Mariazzi. [131] at ¶ 8. During the dinner, plaintiff consumed approximately four pints of beer and Mariazzi consumed four to five pints of beer. [131] at ¶¶ 9-10. It appeared to plaintiff that Mariazzi was impaired. [134] at ¶ 9.

After dinner, plaintiff and Mariazzi went to Hill's bar in Genoa, Illinois. [131] at ¶ 11. Mariazzi acted inappropriately with other patrons, including asking one patron whether he had "fucked his wife," calling plaintiff's brother a "faggot," and telling another patron that he was "a fat ass." [134] at ¶ 10. The bar's owner asked plaintiff to remove Mariazzi from the bar; as they were leaving, Mariazzi jumped on plaintiff's back and plaintiff carried him out of the bar on his back. [134] at ¶ 9; [131] at ¶ 12. Mariazzi was upset, crying, and flailing about while leaving the bar. *Id.* Plaintiff carried Mariazzi to an alley behind a Mobil station located in the 100 block of North Washington in Genoa, Illinois; at this point, he grew tired of Mariazzi slapping him and crying and "rolled" him off his back. [131] at ¶¶ 13; 16. Mariazzi landed on his side on the ground. [131] at ¶ 14. Plaintiff yelled at Mariazzi to stop crying and "carrying on," Mariazzi began crying loudly and flailing his arms around on the ground, and plaintiff told him to "pull himself together and cut it out." [131] at ¶¶ 15, 17-18.

Shortly after rolling Mariazzi, plaintiff observed that the three people Mariazzi had offended, including plaintiff's brother, were running toward him and Mariazzi. [134] at ¶ 16. Plaintiff pushed his brother to the ground because it was "obvious" that his brother was going to beat up Mariazzi. *Id.* The three patrons then walked back to the bar and plaintiff helped Mariazzi up and held him up as they began walking home. [134] at ¶ 17. Mariazzo had difficulty walking so plaintiff leaned him up against the side of a building with his left hand; Mariazzo continued to flail. [134] at ¶ 18.

Officers Chris Hathcoat and Ed Lopez were working as Genoa police officers on July 11th and were the only officers working that night. [131] at ¶¶ 21-22. On the night of the incident, Officer Hathcoat received a radio dispatch of a battery in progress where a "male subject" was choking a "female subject" near the Mobil station located in the 100 block of North Washington in Genoa, Illinois; Officer Lopez received a similar dispatch. [131] at ¶¶ 23-27. For context, Mariazzi was small in stature, had a slender build, and had long hair that he wore in a ponytail. [134] at ¶ 13; [131] at ¶ 27.

A short time later, Officer Hathcoat arrived and observed plaintiff holding Mariazzi up against a nearby wall; the two appeared to match the description of the dispatch. [131] at ¶¶ 19, 27-28. Officer Lopez arrived shortly thereafter and observed Officer Hathcoat speaking to a subject with long hair, Mariazzi, while another subject, plaintiff, was standing nearby. [131] at

¶¶ 29, 31. Officer Hathcoat had separated plaintiff and Mariazzi and had a conversation with Mariazzi about what had occurred. [131] at ¶ 32. During the conversation, he noticed that Mariazzi had cuts and scrapes to his elbows and arms. [131] at ¶ 36. According to Officer Hathcoat's testimony, Mariazzi explained that plaintiff had pushed him in the alley, that his head had hit the ground, that plaintiff grabbed him around the neck while he was on the ground, and that he had essentially been beaten up by plaintiff. [131] at ¶¶ 33-35.

Before moving on, the court notes that it is undisputed that Officer Hathcoat later arrested and charged plaintiff with domestic battery based solely on his conversation with Mariazzi. [152] at ¶ 7. As such, the reliability of the conversation is relevant to Officer Lopez's motion for summary judgment as to whether plaintiff was falsely arrested. In his response to Officer Lopez's statement of facts, plaintiff responded "Deny" to the above statements of fact regarding the conversation between Mariazzi and Officer Hathcoat. *See* [146] at ¶¶ 32-35, 38-39 (response to Officer Lopez's statement of facts). Plaintiff's stated basis for denying these statements of fact are several factors that he claims limit the reliability of Officer Hathcoat's testimony. First, plaintiff points to Officer Hathcoat's testimony that he had difficulty understanding Mariazzi through his thick accent and broken English. *See id.* Second, plaintiff points to evidence that following the incident, Officer Hathcoat asked plaintiff's wife if Mariazzi spoke any English at all. *See id.* On a related note, while not part of his response to the challenged statements of fact, in his statement of additional facts plaintiff notes that Officer Hathcoat has suffered from hearing problems in both ears and currently wears hearing aids. [152] at ¶ 5.

Because the Hathcoat-Mariazzi conversation is relevant to Officer Lopez's motion for summary judgment, the court must determine whether and to what extent the conversation can be considered by the court for purposes of summary judgment. In doing so, the court notes that it is somewhat unclear from plaintiff's Rule 56 response and briefs exactly what he is disputing about the above statements of fact. One possible challenge would be that Officer Hathcoat's testimony establishes that he could not hear or understand anything Mariazzi was saying and, as such, he must have simply fabricated the entire content of the conversation. This type of challenge, if plaintiff were making it, could be understood as an attempt to raise a genuine dispute as to whether the proffered statements occurred at all and, as such, an attempt to keep the court from considering at all Officer Hathcoat's stated basis for arresting plaintiff. However, plaintiff does not appear to be making such a direct challenge, which in any case the court would not accept as a "genuine dispute" because no reasonable jury could read Officer Hathcoat's testimony as an admission that he was totally unable to communicate with Mariazzi.

It is true that when asked "Did you ever ask Barbara Cravatta if Marco Mariazzi speaks English?," Officer Hathcoat replied "I don't recall if I did. Like I said, he was talking to me in English but it was just broken because he was upset, so it was coming across more in Italian form than – and a strong accent. Like I say, it was difficult just obtaining his personal information." [131-4] at 27. Officer Hathcoat also testified with regard to Mariazzi that "He was already hard to understand . . . because of the language barrier," [131-4] at 31, and he agreed with the assertion that "sometimes he was difficult to understand, particularly with regard to

identifying himself[.]" [131-4] at 35. On the other hand, when asked what Mariazzi told him, Officer Hathcoat was able to explicitly recall that "Marco [Mariazzi] said that he had been pushed out in the alley by Mr. Cravatta. He had marks on his elbows and forearms that supported that he had at some point been on the ground." [131-4] at 35. Officer Hathcoat recalled and agreed that Mariazzo told him "that he had been on the ground and that he had been grabbed around the neck" and that "he had, at some point, been pushed or pushed down" and "essentially . . . that he had been beaten up by Chuck Cravatta[.]" [131-4] at 35. There is no basis for the court to bar this conversation from consideration, because it would be unreasonable for any jury to infer from this testimony that Officer Hathcoat could not understand Mariazzi at all.

The other possible challenge, which appears more consistent with plaintiff's arguments, is that Officer Hathcoat's testimony reflects his "best guess" as to what Mariazzi told him; however, the language barrier, Mariazzi's inebriation, and Officer Hathcoat's purported hearing problems should have caused Officer Hathcoat to seriously doubt whether he was accurately understanding what Mariazzi was trying to convey. This type of challenge is better understood as a clarification as to the degree to which Officer Hathcoat's testimony is undisputed for purposes of summary judgment, namely that it is limited to his own subjective understanding regarding Mariazzi's statements, as well as an emphasis on additional facts that purportedly limit the objective reasonableness of that subjective understanding. In other words, plaintiff is pointing out that the court should not simply take Officer Hathcoat's testimony about his conversation with Mariazzi at face value, but rather should consider the context in which that conversation took place, taking all inferences in favor of plaintiff, when determining if there is a genuine dispute as to whether plaintiff's arrest was supported by probable cause. The court agrees that this is proper for summary judgment purposes.

Moving on to the remaining events, while Officer Hathcoat was speaking with Mariazzi, Officer Lopez was speaking with plaintiff. [131] at ¶ 37. Plaintiff asked Officer Lopez why the police were present, and Officer Lopez responded that the police had received a call of someone holding down someone and choking them. [134] at ¶ 25. Officer Lopez attempted to obtain identifying information from plaintiff, who questioned the need for the information but ultimately provided the information. [134] at ¶ 26.

What occurred next is disputed. According to plaintiff, Officer Lopez asked him what had happened between plaintiff and Mariazzi and he responded that Mariazzi was getting out of control and that he was trying to calm him down and get him home. [146] at ¶ 28 (response to Genoa's and Walker's statement of facts). According to plaintiff, Officer Lopez became somewhat confrontational and "wasn't so much as asking me as telling me that I . . . was beating up my son in law." *Id.* at ¶ 27. At some point during this conversation, plaintiff's brother arrived at the scene. *Id.* at ¶ 29. According to plaintiff, at some point "I felt [Officer Lopez] was done asking me questions and he turned to go talk to Officer Hathcoat. When he turned to go talk to him, I turned to go talk to my brother[.]" [131-3] at 45. At that point, "I hadn't even taken a step. All I did is I had taken my hands down. I pivoted, and I was – I had not even taken a step when Officer Lopez grabbed me by the arm and sucker punched me is what he did." *Id.*;

[146] at ¶ 30 (response to Genoa's and Walker's statement of facts).  According to plaintiff, he had not told Officer Lopez that he was leaving and was not attempting to leave the scene when he was struck.  [152] at ¶ 13.  Plaintiff did not raise his hands to Officer Lopez and did not pull away or walk away when Officer Lopez grabbed his arm.  [152] at ¶ 14.  Officer Lopez punched plaintiff twice in the face while holding his arm.  [152] at ¶ 15.

Shortly thereafter, plaintiff was handcuffed.  [146] at ¶ 33 (response to Genoa's and Walker's statement of facts).  While plaintiff was  secured in handcuffs against a squad car, Officer Lopez kneed plaintiff in the thigh.  [152] at ¶ 17.  There was no basis for this action as plaintiff was fully cooperative and not resisting.  [146] at ¶ 33 (response to Genoa's and Walker's statement of facts).

After the incident, plaintiff was arrested for domestic battery and aggravated assault and brought to be booked at the police department.  [134] at ¶ 34; [131] at ¶¶ 39, 40.  Officer Hathcoat's stated purpose for the domestic battery arrest was Mariazzi's statements as to plaintiff beating him up.  [131] at ¶ 39.  The aggravated assault was in relation to his encounter with Officer Lopez.  [131] at ¶ 40.  While plaintiff was being booked, Officer Lopez drove Mariazzi back to plaintiff's home.  [152] at ¶ 19.

The following day, plaintiff contacted Mayor Walker, who plaintiff considered to be a personal friend; plaintiff recounted the incident with the expectation that Mayor Walker would open an investigation.  [134] at ¶ 35.  Instead Mayor Walker instructed plaintiff to contact then Police Chief Ty Lynch, who was Chief at the time of the incident and has since retired and been replaced by Chief Smith.  *Id.*  After speaking to plaintiff, Mayor Walker contacted Chief Lynch and explained that plaintiff had contacted him, that he had instructed plaintiff to contact Chief Lynch if he wanted to conduct an investigation into the incident, and advised Chief Lynch that plaintiff would likely be contacting him in the future.  [134] at ¶ 38.  In fact, plaintiff did not ever contact Chief Lynch.  [134] at ¶ 35.

As a result of the June 23, 2011 incident, plaintiff was charged in 2011 with two counts of domestic battery and one count of aggravated assault.  [134] at ¶ 39.  On January 24, 2013, based on rumors that plaintiff was going to be offered a plea deal, Mayor Walker requested that City Attorney Jack Slingerland write a letter to the state's attorney.  [134] at ¶ 41.  The letter states as follows:

> I am the city Attorney for the City of Genoa Illinois, and am corresponding with you at the request of Mayor Todd Walker.  I am writing to express to you the interest of the Mayor and other city officials in the prosecution of Charles Cravatta in case 11 CM 1143.  Mr. Cravatta is charged with Domestic Battery and with Aggravated Assault.
> I am writing to request that I be notified in advance of the status of any ongoing plea negotiations prior to the disposition of the charges.  It is the City's request that the charge of Aggravated Assault not be dismissed.

[134] at ¶ 42; [134-2] at 57.  Mayor Walker testified that the letter was intended to resolve a lack of communication between the state's attorney and Chief Lynch and also based on Mayor

Walker's desire to see the prosecution through. [153] at ¶¶ 72, 74. Chief Lynch testified that he could not recall communication problems with the state's attorney. [153] at ¶ 73.

Plaintiff did not received a plea deal from the state's attorney's office and none of the charges were dismissed. [153] at ¶ 77. Plaintiff underwent at least $32,000 total in legal fees. *Id.* Ultimately, plaintiff was found not guilty at trial by a jury. [153] at ¶ 21.

B. Hiring Officer Lopez.

As noted, Genoa has moved for summary judgment on plaintiff's claim that it failed to properly screen Officer Lopez before hiring him. The circumstances leading to Genoa hiring Officer Lopez as a part-time police officer are as follows.

In 1992, Officer Lopez was hired as a police officer by Hanover Park and has remained an officer at Hanover Park continuously since 1992. [134] at ¶ 50. To become a police officer, he underwent a physical test, written exam, and interviews. [134] at ¶ 51. Afterwards, he attended the Cook County Police Academy. *Id.* During his employment with Hanover Park prior to being hired by Genoa, Officer Lopez received multiple commendations and letters of recognition for outstanding service; several community members and police departments wrote letters to the Hanover Park Police Department praising Officer Lopez's work as a police officer. [134] at ¶ 54. Officer Lopez was subject to annual performance reviews as a Hanover Park officer. [134] at ¶ 55. For review periods ending in 1999, 2000, 2002-2006, and 2008-2010 he received an Exceeds Expectations rating; in 2007, he received meets job requirements. *Id.*

On the other hand, during this same period Officer Lopez was subject to discipline on several occasions, including routine issues like failing to notify his supervisor that he was going to be late, six incidents of failing to attend court, failing to turn in reports on a timely basis, failing to meet quarterly patrol performance standards, and separate incidents of patrol vehicle damage, failing to report damage to a squad car, and leaving his vehicle unsecured. [134] at ¶ 52. According to plaintiff, he was also given written discipline on November 15, 2003 for failure to write an internal use of force report when force beyond mere physical contact was made. *Id.* Further, according to plaintiff, Officer Lopez was suspended for 30 days on September 11, 1995 for driving a minor civilian to a dark baseball field with his lights off, slapping the civilian, and grabbing him when the civilian attempted to walk away, causing the civilian to fall. [134] at ¶¶ 52-53. He was suspended for endangering the life and health of a child, official misconduct, unauthorized and improper use of a department vehicle, battery, failure to complete a required report and being less than truthful about the event, conducting himself in a manner less than truthful, committing unlawful conduct, negatively influencing the training and performance of a probationary officer, violating his lawful authority in acceptable levels of conduct, and failing to properly document the event. [153] at ¶ 37.

In October of 2010, Officer Lopez was hired as a part time police officer for Genoa. [134] at ¶ 56. To become a part-time officer, he completed a written application. *Id.* It is undisputed that Officer Lopez did not fully disclose his prior work history, his military service,

or his full disciplinary history from Hanover Park in his application.  [134] at ¶ 59.  For example, with regard to discipline, Officer Lopez only reported that he had been disciplined for failing to attend court and failing to report minor damage to a squad car.  *Id.*

Officer Lopez was interviewed by Officer Greg Edwards.  [134] at ¶ 56.  During the interview, Officer Lopez admitted that he had failed to disclose in his written application that he worked for a short time as a part time officer for the Kingston Police Department, describing it as having "slipped his mind and was kind of an embarrassment."  [134] at ¶ 61.  Officer Lopez told Officer Edwards that the public has accused him of being insensitive, discourteous, intimidating, or condescending.  [134] at ¶ 62.

Following the interview, Officer Edwards was responsible for conducting a background investigation of Officer Lopez.  [134] at ¶ 60.  The parties dispute whether the policies and procedures of the Genoa Police Department that governed the hiring of part-time police officers at the relevant time complied with the standards established by the Commission on Accreditation for Law Enforcement Agencies ("CALEA").  [134] at ¶ 48.  The CALEA standards for background investigations of prospective officers include: A) verification of qualifying credentials; B) a review of a criminal record; C) verification of at least three personal references.  [134] at ¶ 49.  Nonetheless, it does not appear disputed, however, that Genoa's hiring standards for reviewing an applicant's application required verification of qualifying credentials, reviewing the applicant's criminal record, and verification of at least three of the applicant's personal references.  [134] at ¶ 57.

With regard to written information, Officer Edwards obtained Officer Lopez's criminal history, driver's license information, and FOID cards.  [134] at ¶ 67.  Other than this, according to plaintiff, the only written background information Officer Edwards reviewed was that provided by Officer Lopez.  [134] at ¶ 60.  Plaintiff points out that Genoa had a waiver from Officer Lopez for the release of all Hanover Park information.  *Id.*

With regard to interviews, Officer Edwards contacted the references listed by Officer Lopez, including two references from the Genoa Fire Department that worked with Officer Lopez.  [134] at ¶ 68.  During an interview questionnaire of Scott Garetts, one of the fire department references, Garetts indicated that Officer Lopez "usually" complied with employment policies and rules.  [134] at ¶ 63.  Garetts also indicated that Officer Lopez's attendance was below average, he had no opinion on plaintiff's drug use or illicit conduct, and did not know what Officer Lopez's supervisor's thoughts of Officer Lopez.  [134] at ¶ 63.  Officer Edwards also spoke to the Kingston Chief of Police, who recommended Officer Lopez.  [134] at ¶ 69.

At some point during the background check, Officer Edwards spoke to then Sergeant Smith, who is currently Chief of Police at Genoa.  [134] at ¶ 65.  Officer Edwards informed Sergeant Smith that he had completed everything in the background check except for speaking to someone from Hanover Park.  *Id.*  Sergeant Smith decided to contact Hanover Park himself and spoke to Officer Lopez's supervisor at Hanover Park, Sergeant Eric Villanueva.  *Id.*  Sergeant

Villaneueva recommended plaintiff for employment; he reported that he had had no disciplinary issues with Officer Lopez, and reported no problems with Officer Lopez. [134] at ¶¶ 65, 74. Plaintiff points out that Sergeant Villaneueva had disciplined Officer Lopez in 2010 and had been interviewed during the investigation leading to plaintiff's 30-day suspension. [146] at ¶ 74. Following this conversation, no one from Genoa contacted the Hanover Park Chief of Police or reviewed Officer Lopez's personnel file. [134] at ¶ 66. In fact, no further inquiries of any kind were made to Hanover Park during the background check. [134] at ¶ 74.

Following the background check, Officer Edwards concluded that Officer Lopez "only had a couple minor write-ups through his career for missing court and a small accident with a squad car." [153] at ¶ 46.

The parties dispute who had ultimate authority to hire part-time police officers. Plaintiff points out that in 2011, Genoa Ordinance 5-1-8 required the Mayor to appoint part-time police officers, with interviews for the positions to be conducted by the Chief of Police, Mayor, and Chairmen of the Public Health & Safety Committee of the City Council. [153] at ¶ 22. Defendants point out that in practice the hiring of part-time officers was done by the Chief of Police. *Id.* Plaintiff proffers evidence that the hiring of part-time officers was the responsibility of the Chief. [153] at ¶ 28. Regardless, it is not disputed that following the background check, it was Chief Lynch's responsibility to review the application and investigation in its entirety for red flags before hiring Officer Lopez. [153] at ¶ 47. On approximately December 20, 2010, Chief Lynch hired plaintiff based on Officer Edwards's and Sergeant Smith's investigation. [153] at ¶ 48. There does not appear to be any dispute that Chief Lynch made this decision without input from Mayor Walker or the City Council.

As noted, Officer Lopez did not fully disclose his disciplinary history. It is undisputed that throughout the background investigation, Officer Edwards was not made aware of any discipline other than that disclosed by Officer Lopez, did not know that Officer Lopez had omitted disciplinary history, and would have further followed up on any of the interview or written questions if he believed Officer Lopez was not being truthful. [134] at ¶¶ 71-73. Further, Chief Lynch did not learn of any omitted disciplinary history until the instant lawsuit was filed. [134] at ¶ 76. Chief Lynch testified that he believed additional information should have been supplied by Hanover Park. [153] at ¶ 51. Now Chief Smith admitted in his deposition that some more investigation should have been done before hiring Officer Lopez. [153] at ¶ 47.

According to plaintiff's expert, Genoa failed to properly screen Officer Lopez. [134] at ¶ 58. Plaintiff's expert opined that Officer Edwards did not sufficiently follow up on his interview questions regarding Officer Lopez's failure to disclose his prior part-time employment and should have asked why members of the public had accused him of being "insensitive, discourteous, intimidating, or condescending." *Id.* Further, plaintiff's expert opined that Officer Edwards should have conducted a more thorough investigation and follow up with Scott Garetts, plaintiff's reference from the fire department. *Id.* Sergeant Smith or Officer Edwards should have spoken to the Hanover Park Police Chief to verify Sergeant Villanueva's statements and should have obtained and reviewed a copy of Officer Lopez's personnel file. *Id.* Plaintiff's

expert also opined that all interviews should have been conducted in person but were not. *Id.*
Finally, Officer Edwards should have obtained a pre-employment drug screen and psychological test. *Id.*

C. Relevant Policies and Procedures of the Genoa Police Department.

Relevant to Genoa's and Mayor Walker's motion for summary judgment are various Genoa policies and practices regarding the use of force, including directives on the acceptable use of force, training regarding the acceptable use of force, as well as the review, supervision, and investigation of officers' use of force in the field. As a preliminary matter, the parties dispute whether Chief Lynch is the final decision maker for Genoa regarding police policies and practices. Section 5-1-5 of the Genoa Municipal Code provides that "The Chief of Police may make or prescribe such rules and regulations of the conducts and guidance of the members of the Police Department as he shall deem advisable, and such rules, when approved by the Mayor and Council, shall be binding on such members." [134] at ¶ 46. Plaintiff points to evidence that this ordinance is not followed in practice, in that the Chief of Police does not require approval. [146] at ¶ 46. According to plaintiff, the Chief of Police promulgates police department policies on behalf of Genoa. [153] at ¶ 26. Plaintiff proffers evidence that the Chief has the authority to revise, change, draft, and issue the police policy and procedure manual. [153] at ¶ 27.

The Genoa Police Department maintains an official policy directing officers regarding the use of force. [134] at ¶ 43. Genoa policy regarding use of less than lethal weapons states that the face is a non-target area and should be avoided unless absolutely necessary. [153] at ¶ 59. The parties dispute whether hands are included in this policy or only impact weapons. *Id.* Chief Lynch testified that in certain circumstances, punching someone to the face could constitute deadly force. [153] at ¶ 60. The Genoa use of force continuum lists punches, kicks, forearm, and knee strikes as permissible use of force on an active resister. [153] at ¶ 65. The policy states that police officers are allowed to respond with greater force than that offered by the offender because the goal of force is to exercise control over the offender, not to reach a stalemate with the offender. [134] at ¶ 45. Chief Lynch agreed that a police officer can only use force as reasonable under the circumstances and a police officer is not allowed to use more force than is necessary "because the policies and procedures and State statutes say you can only use force which is necessary." [134-2] at 123. Chief Lynch testified that he believed that Officer Lopez's use of force "was reasonable use of force based on what was presented to us" and was in compliance with all Genoa policies. [134-2] at 24.

It is disputed whether and to what degree Genoa police officers receive periodic training regarding developments in the law. [134] at ¶ 47. The court notes that plaintiff cites a number of ordinances from after 2012 and attempts to infer that they were in place before 2011 by showing testimony of Genoa officers who did not recall any changes. *See e.g.* [153] at ¶ 24.

Genoa written policy requires an investigation of major incidents, including use of force incidents with the strong potential for civil liability. *See* [153] at ¶ 55. With regard to previous incidents, Chief Lynch is aware of only one other instance where an officer punched a citizen in

the face; it happened "a long time ago" and did not involve any of the officers involved in this lawsuit. [134] at ¶ 79. With regard to the instant case, Chief Lynch testified that "I didn't do an investigation – specific investigation. I did do a review of the reports and the paperwork." [134-2] at 11. Chief Lynch testified that when force is used there is "typically" an annual review, but that the annual review procedure was not followed in this case "[b]ecause of the civil litigation – or the possible pending civil litigation" and agreed that although it is not written policy, "[i]t would be my policy" that there will be no investigation of an incident when there is potential for future civil liability. [134-2] at 12-14. As such, Chief Lynch testified that he did not review the officers' criminal trial testimony because "I believe there is going to be a time where it will be important to do that. I think it's going to be after your civil litigation is done that I will review trial testimony and see if there's training needs or if there's specific needs that I need to address." [134-2] at 11. When asked if he had reviewed Genoa policies to determine whether Officer Lopez's actions in this matter violated policies, Chief Lynch testified that "No. I guess I figured that's what the civil action would do." [134-2] at 12. He acknowledged that because the civil action was filed approximately a year after the incident, this meant that "July 2011 to July 2012 [he] didn't undertake an investigation of this incident." *Id.*

On the other hand, Chief Lynch also testified that he did comply with a Genoa policy titled Administrative Analysis requiring him to review use of force investigation reports; he testified regarding the Administrative Analysis policy "What this is asking is, did I review the reports, did I make sure that there were elements of a criminal investigation and justifiable use of force, and then is there compliance with the departmental written directives? That's what this is asking me. And yes, I did do that[.]" [134-2] at 17. He agreed that this entailed reviewing Officer Lopez's use of force to determine that it complied with "the use of force policy" and that he reviewed it "within the next couple days after the incident." *Id.*

Regarding investigations of citizen complaints surrounding officers' use of force, Genoa's written policy states that it will "not erect barriers to the complaint process by requiring complainants to speak only to particular persons, make their complaint in person, or otherwise make the complaint process inconvenient." [153] at ¶ 66. On the other hand, Chief Lynch testified that a complaint of misconduct could only be investigated with a sworn complaint from the complainant, in this case plaintiff. [153] at ¶ 58. Chief Lynch testified that for a citizen to make an official complaint to lead to a formal investigation, "you have to file an official complaint, and that complaint has to be notarized by somebody within our department." [134-2] at 14. When Chief Lynch was asked what the department would do if a citizen makes an informal complaint, he responded "we would run into looking into – I can't – I don't know how far I can take that, because there's not an official complaint." *Id.*

**II. ANALYSIS**

The court will first analyze Officer Lopez's motion for summary judgment on Count IX. The court will next analyze Genoa's and Mayor Walker's joint motion for summary judgment on Counts III, V, VI, VII, VIII, and XI.

A. Officer Lopez's Motion for Summary Judgment (False Arrest Claims - Count IX).

Officer Lopez moves for summary judgment on Count IX of plaintiff's complaint, alleging false arrest. Officer Lopez argues that even if there was no probable cause to arrest for assault, plaintiff's false arrest claim must fail because there was probable cause to arrest him for domestic battery. Plaintiff counters that there was no probable cause to arrest him for either offense.

As Officer Lopez points out, "[t]he existence of probable cause to arrest a suspect for any offense, even one that was not identified by the officers on the scene or in the charging documents, will defeat a Fourth Amendment false-arrest claim." *Sroga v. Weiglen*, 649 F.3d 604, 608 (7th Cir. 2011). The relevant standard for probable cause as relevant to this case was set forth by the Seventh Circuit in *Matthews v. City of East St. Louis*, 675 F.3d 703 (7th Cir. 2012):

> Probable cause is a determination made from assessing whether, based on the facts and circumstances at the time of the arrest, a reasonable officer would conclude that the suspect has committed or is committing a crime. The sufficiency of the evidence for a determination of probable cause need not be enough to support a conviction or even enough to show that the officer's belief is more likely true than false. As such, as long as a reasonably credible witness or victim informs the police that someone has committed a crime, or is committing, a crime, the officers have probable cause. Additionally, this court has emphasized that once probable cause has been established, officials have no constitutional obligation to conduct further investigation in the hopes of uncovering potentially exculpatory evidence.

*Id.* at 706-07 (internal citations and quotations omitted).

Here, Officer Lopez points to Officer Hathcoat's testimony that he arrested plaintiff for domestic battery because Mariazzi told him that plaintiff beat him up. As discussed at length in the statement of facts above, plaintiff argues that there is a genuine dispute as to whether Mariazzi's statements were sufficient for probable cause due to the language barrier, his intoxication, and Officer Hathcoat's hearing problems. Essentially, plaintiff's argument is that a reasonable jury could infer that Officer Hathcoat was unable to understand or trust Mariazzi's statements sufficiently to consider him a "reasonable witness or victim."

After review, the court cannot accept plaintiff's argument. While the court is required to make all reasonable inferences in favor of plaintiff, no reasonable fact finder could accept plaintiff's proposed inference from the facts in this record. Much of plaintiff's argument is based on a mischaracterization of Officer Hathcoat's testimony. In fact, Officer Hathcoat's testimony makes it clear that he understood much of what Mariazzi was telling him, despite it

being in a heavy accent. The fact that he found it difficult to understand Mariazzi at certain times, such as when asking identifying questions, does not mean that he was unable to understand the parts of the conversation that he specifically recalled and testified to. Moreover, there is no evidence that Officer Hathcoat's alleged hearing difficulties, regardless of whether they existed at the time of plaintiff's arrest, prevented him from hearing Mariazzi in this instance.

Finally, despite the fact that Mariazzi was intoxicated, the surrounding circumstances corroborated his statements sufficiently to make him a "reasonably credible witness or victim" for purposes of probable cause. First, the statements would have appeared to confirm the reason Officer Hathcoat had been called to the scene in the first place, namely a third party witness calling the police because they saw a "man" choking or beating up a "woman," who in many respects matched Mariazzi's description. Second, Officer Hathcoat noticed that Mariazzi had cuts and scrapes to his elbows and arms, which by themselves may have been insufficient to show wrongdoing, but nonetheless were corroborative of Mariazzi's statements that plaintiff had caused him to hit the ground. As such, even when taking all inferences in favor of plaintiff, the undisputed facts show that there is no genuine dispute that the officers had probable cause to arrest plaintiff for domestic battery.

For the foregoing reasons, Officer Lopez's motion for partial summary judgment as to Count IX is granted.

B. Genoa's and Mayor Walker's Motion for Summary Judgment.

1. Battery Claims against Genoa (Counts III & V).

In Count I, plaintiff claims that Officer Lopez violated his constitutional rights through the use of excessive force. In Count II, plaintiff seeks indemnification from Genoa for Officer Lopez's alleged excessive force. In Count III, which is explicitly referenced as an alternative to Count II, plaintiff claims that Genoa is liable because Officer Lopez's actions were willful and wanton. *See* 745 ILCS 10/9-102 (municipalities directed to pay tort judgment where employee is acting in the scope of employment); 745 ILCS 10/2-202 ("A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct."). Relatedly, in Count IV, plaintiff claims that Officer Lopez committed the Illinois state law tort of battery, and in Count V claims that Genoa is liable under a theory of respondeat superior. Genoa seeks summary judgment on Counts III and V, arguing Officer Lopez's actions were not willful and wanton. Genoa further argues that Counts III and V are duplicative, because both counts require willful and wanton behavior.

Genoa's arguments must fail on this record for summary judgment purposes. The Illinois Tort Immunity Act defines willful and wanton conduct as: "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1–210. The Seventh Circuit has held that "[a]lthough willful and wanton conduct consists of

more than mere inadvertence, incompetence, or unskillfulness, it need not be an intentional act; rather, it may be an act committed under circumstances exhibiting a reckless disregard for the safety of others." *Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008) (internal quotations omitted). Moreover, "[w]hether an officer acted in such fashion is normally a question of fact to be determined by the jury." *Id.* (internal quotations omitted).

Here, the court finds no reason to depart from the Seventh Circuit's admonition that the determination of willful and wanton behavior should normally be a question of fact for the jury. As recounted in the court's discussion of the facts, according to plaintiff's version of events, Officer Lopez struck him twice in the face without basis or provocation and later kneed him in the thigh after he was already secured in handcuffs against a squad car, not offering resistance. As such, the court agrees with plaintiff that whether Officer Lopez "exhibit[ed] a reckless disregard for the safety of others" depends on the resolution of genuinely disputed issues of fact and cannot be resolved on summary judgment.

With regard to Genoa's argument that Counts III and V are duplicative, the court agrees that both counts require a finding that Officer Lopez's actions were willful and wanton. On the other hand, plaintiff need not only show willful and wanton behavior, but must also prove the underlying elements; because state law battery and § 1983 excessive force have different elements, the court will not find at this time that they are duplicative.

For the foregoing reasons, the court denies Genoa's motion for summary judgment with regard to Counts III and V.

2. Ratification of excessive force claim against Genoa (Count VI).

In a somewhat related claim, plaintiff claims that Chief Lynch, as a "final decision maker" for Genoa, officially ratified Officer Lopez's use of force in this case and as such should be liable for Officer Lopez's actions. Genoa moves for summary judgment, contending that Chief Lynch was not a final decision maker for Genoa and did not ratify plaintiff's actions.

The court need not decide whether Chief Lynch was a final decision maker in this instance, because it is clear that plaintiff's ratification theory must fail. As an initial matter, "[i]t is well settled that the doctrine of respondeat superior may not be employed to impose § 1983 liability on a supervisor for the conduct of a subordinate that violates a citizen's constitutional rights." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994). "Supervisory liability may attach, however, where a supervisor, with knowledge of a subordinate's conduct, approves of the conduct and the basis for it." *Id.*

The Seventh Circuit in *Kernats* noted that a 1983 claim based on ratification requires that the plaintiff show that "[t]he supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)). In *Kernats*, the plaintiffs claimed that they had been subject to unconstitutional seizure by a police officer. The chief of police for the police

department "met with the [plaintiffs] several days later and [later] wrote them a letter attempting to explain and justify [the officer's] actions. By this time, of course, any unconstitutional seizure that may have taken place had been accomplished and [the chief] could have done nothing to undo that fact." *Kernats*, 35 F.3d at 1182-83. The chief also attempted to dissuade the plaintiff's from suing or bringing their case to the media. The Seventh Circuit rejected the plaintiffs' attempt to impose liability on the chief on a theory of ratification. The court noted that the plaintiffs "do not allege that [the chief] observed, directed, ignored, approved, participated in any way, or even knew about the incidents . . . as they were taking place," *id.* at 1182, and concluded that "[the chief's] ex post attempt to dissuade the [plaintiffs] from taking their case to the media (or the courts) by rationalizing [the officer's] behavior is not the type of involvement in a constitutional violation that gives rise to § 1983 liability."

This case is analogous to *Kernats*. Plaintiff does not allege that Chief Lynch "observed, directed, ignored, approved, participated in any way, or even knew about" Officer Lopez's actions "as they were taking place." *See id.* at 1182. Chief Lynch's ex post decision not to discipline Officer Lopez thus does not rise to ratification under Seventh Circuit precedent. Ratification would be particularly improper here because it is not disputed that the use of force incident reports that Officer Lopez submitted reflect a substantially different scenario than plaintiff's version of the story. While the court must accept plaintiff's version of the events for purposes of summary judgment, there is no evidence that Chief Lynch believed plaintiff's version or was even aware of it at the time he decided not to discipline Officer Lopez.

For the foregoing reasons, Genoa's motion for summary judgment is granted with respect to plaintiff's ratification theory of liability.

3. Failure to Screen Claims against Genoa (Count VII).

In Count VII, plaintiff claims § 1983 liability against Genoa for failing to properly screen Officer Lopez before hiring him as a part-time police officer. As noted, plaintiff argues that Genoa: should have conducted its interviews in person; should have obtained a pre-employment drug screen or psychological test; should have followed up on Officer Lopez's interview admission that members of the public have accused him of being "insensitive, discourteous, intimidating or condescending"; should have followed up on Scott Garett's interview, including his statement that Officer Lopez "usually" complied with employment policies and rules; and, most important, should have verified Sergeant Villanueva's positive statements by interviewing the Hanover Park Police Chief and reviewing Officer Lopez's personnel file. Plaintiff contends that a "cursory" check of Officer Lopez's disciplinary history would have revealed his 30-day suspension for endangering a minor.

Before examining the relevant caselaw surrounding this issue, the court notes that plaintiff did not dispute that neither Officer Edwards nor Chief Lynch were aware that Officer Lopez had omitted parts of his disciplinary history; plaintiff also did not dispute that Officer Edwards, who was responsible for conducting the screening investigation, would have followed up if he believed Officer Lopez was not being truthful. *See* [134] at ¶¶ 71-73, 76. The Seventh

Circuit has noted that "although it is permissible to base a § 1983 claim on a failure to screen properly a candidate for a public position, our case law makes clear that the plaintiff must allege and establish that the defendants went about the hiring process with 'deliberate indifference.'" *Kitzman-Kelley, on behalf of Kitzman-Kelley v. Warner*, 203 F.3d 454, 458-59 (7th Cir. 2000). Moreover, "the 'deliberate indifference' standard is not met by a showing that hiring officials engaged in less than careful scrutiny of an applicant resulting in a generalized risk of harm." *Id.* at 459.

The Supreme Court's decision in *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397 (1997) is highly instructive and is worth examining at length. The Court noted that "predicting the consequence of a single hiring decision, even one based on an inadequate assessment of a record, is far more difficult than predicting what might flow from the failure to train a single law enforcement officer as to a specific skill necessary to the discharge of his duties." *Id.* at 410. As such, a municipal actor is not deliberately indifferent simply because he negligently fails to review all relevant sources for an applicant:

> "[D]eliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Unlike the risk from a particular glaring omission in a training regimen, the risk from a single instance of inadequate screening of an applicant's background is not "obvious" in the abstract; rather, it depends upon the background of the applicant. A lack of scrutiny may increase the likelihood that an unfit officer will be hired, and that the unfit officer will, when placed in a particular position to affect the rights of citizens, act improperly. But that is only a generalized showing of risk. The fact that inadequate scrutiny of an applicant's background would make a violation of rights more likely cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation. After all, a full screening of an applicant's background might reveal no cause for concern at all; if so, a hiring official who failed to scrutinize the applicant's background cannot be said to have consciously disregarded an obvious risk that the officer would subsequently inflict a particular constitutional injury.

*Id.* at 410-411.

The facts of *Brown* are similar to this case. In *Brown*, the plaintiff claimed that a deputy sheriff, Burns, had arrested her with excessive force, and claimed that Burns's superior, Sheriff Moore, had hired Burns without adequately reviewing his background. Sheriff Moore had obtained Burns's driving and criminal history, but "had not closely reviewed either" before hiring him, despite the fact that they revealed "various driving-related and other misdemeanors, including assault and battery, resisting arrest, and public drunkenness." *Id.* at 401. The Supreme Court rejected plaintiff's § 1983 failure to screen claim based on this record:

> We assume that a jury could properly find in this case that Sheriff Moore's assessment of Burns' background was inadequate. Sheriff Moore's own testimony indicated that he did not inquire into the underlying conduct or the disposition of any of the misdemeanor charges reflected on Burns' record before hiring him. But

this showing of an instance of inadequate screening is not enough to establish "deliberate indifference." In layman's terms, inadequate screening of an applicant's record may reflect "indifference" to the applicant's background. For purposes of a legal inquiry into municipal liability under § 1983, however, that is not the relevant "indifference." A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

*Id.* at 411.

Here, Genoa conducted an investigation by reviewing Officer Lopez's application, interviewing him, interviewing his personal references, conducting a criminal background check, and interviewing a supervisor at each of the two departments where he had worked as an officer. The investigation did not reveal any significant red flags with regard to disciplinary history and all of Officer Lopez's superiors recommended him. While plaintiff may be correct that Genoa failed "to adequately scrutinize the applicant's background," this does not constitute "deliberate indifference." *See id.* The undisputed facts reveal that the screening officers were simply unaware that Officer Lopez had a history of using excessive force. In *Brown*, the Supreme Court found that the defendant was not deliberately indifferent even though he was on notice that the applicant had a criminal history, which included potentially violent crimes. Here, the Genoa officers had even less awareness of disciplinary red flags. As such, Genoa was not deliberately indifferent and plaintiff's failure to screen claim must fail.

For the foregoing reasons, the court grants Genoa's motion for summary judgment with regard to plaintiff's failure to screen claims.

4. Failure to Train, Supervise, or Discipline Claims against Genoa (Counts VI, VII, and VIII).

Plaintiff raises several additional § 1983 *Monell* claims against Genoa, including failure to train claims in Count VIII, contending that "the city of Genoa has a policy and practice of failing to train its officers about tactics that would violate an arrestee's 5th amendment rights against self-incrimination when performing an on-the-scene seizure, Terry stop, and/or custodial interrogation." [46] at 18. Plaintiff also raises failure to train, supervise, and discipline claims in Count VII, contending that "the city of Genoa has a widespread practice and custom of failing to properly screen, train, monitor, and discipline Officer Lopez and other officers similarly situated from engaging in unconstitutional misconduct." [46] at 16. Relatedly, in Count VI, plaintiff alleges that Genoa's "failure to follow its written policies and procedures" create unwritten policies "that condone, facilitate, and perpetuate subordinate officer misconduct and violation of constitutional rights." [46] at 12.

As an initial matter, the court notes that some of plaintiff's allegations in these claims fail to raise a genuine issue of material fact. For example, plaintiff's claim in Count VIII that Genoa failed to train its officers regarding *Miranda* rights and custodial interrogation fails for several reasons. First, even plaintiff's version of events does not support the conclusion that plaintiff was "in custody" when Officer Lopez was speaking to him prior to striking him. More importantly, plaintiff is not alleging a Fifth Amendment injury, he is alleging that Officer Lopez used excessive force against him. As such, plaintiff's claims are more cognizable as a claim that Genoa failed to train its officers to avoid excessive force during encounters with the public, including during *Terry* stops. Ultimately, plaintiff's Count VIII failure to train claims are either not supported by the record or duplicative of his failure to train claims in Count VII. As such, the court will grant Genoa's motion for summary judgment with respect to Count VIII. *See Hoagland ex rel. Midwest Transit, Inc. v. Sandberg, Phoenix & von Gontard*, P.C., 385 F.3d 737, 744 (7th Cir.2004) (noting that duplicative claims should be dismissed).

Further, to the extent that plaintiff claims that Genoa failed to adequately monitor or discipline Officer Lopez specifically, the claim must fail. Plaintiff has not pointed to any prior use of force incidents Officer Lopez was involved in while working for Genoa, or any other basis for Genoa needing to discipline him. While plaintiff points out that Officer Lopez was not disciplined for this incident, this could not be the moving force behind plaintiff's injury because Genoa's alleged failure to discipline necessarily occurred after his interactions with Officer Lopez.

Plaintiff's various remaining claims in Counts VI and VII are closely interrelated and should be analyzed together. In response to defendant's argument that plaintiff has not shown any evidence of widespread violations to support his claims, plaintiff claims in effect that Genoa had an unwritten policy of failing to train, supervise, or discipline its officers with regard to use of force, and as such effectively condones excessive force. Plaintiff acknowledges that official policies exist as to each of these areas, but argues that there is at least a genuine issue of fact as to whether Genoa follows them. As an initial matter, the Seventh Circuit has held that "this court has consistently held that 42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices. In other words, the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) (internal citations and quotations omitted). As such, plaintiff's repeated arguments that Genoa has violated its policies is not sufficient; the court must look directly at whether the evidence can support plaintiff's claims that Genoa's actions were deliberately indifferent.

The relevant standard for *Monell* deliberate indifference was set forth by the Supreme Court in *Connick v. Thompson*, 563 U.S. 51 (2011):

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on

a failure to train. Deliberate indifference is a stringent standard of fault, requiring
proof that a municipal actor disregarded a known or obvious consequence of his
action. Thus, when city policymakers are on actual or constructive notice that a
particular omission in their training program causes city employees to violate
citizens' constitutional rights, the city may be deemed deliberately indifferent if
the policymakers choose to retain that program. The city's policy of inaction in
light of notice that its program will cause constitutional violations is the
functional equivalent of a decision by the city itself to violate the Constitution. A
less stringent standard of fault for a failure-to-train claim would result in de facto
respondeat superior liability on municipalities.

*Id.* at 61-62.

While the Court in *Connick* was specifically analyzing *Monell* deliberate indifference in
the context of failure to train claims, courts in the Seventh Circuit have applied a similar
framework to failure to supervise or discipline claims. *See, e.g., Decker v. City of Greenfield*,
2016 WL 70851, at \*5 (S.D. Ind. January 6, 2016) ("To establish liability based on the City's
failure to supervise and discipline its officers, the plaintiff must show "deliberate indifference"
on the part of the City. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).
"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor
disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51,
61 (2011) (internal quotation marks and citation omitted). Thus, when City policymakers are on
actual or constructive notice that their persistent failure to supervise and/or discipline
subordinates will cause constitutional violations, the City may be deemed deliberately indifferent
to the consequences of its inaction.").

The Seventh Circuit has held that *Monell* liability for failing to prevent excessive force
will typically arise only when a municipality is aware that its officers are engaging in improper
behavior that must be corrected. In *Dye v. Wargo*, 253 F.3d 296 (7th Cir. 2001), the plaintiff
raised a failure to train claim against a city for failing to train its police officers to avoid
excessive force. The court rejected the claim, finding that:

Although [the plaintiff] contends that [the city] did not properly train [the
officers], shortcomings of this kind do not establish direct liability, because the
Constitution does not require municipalities to conduct training programs. Poor
training is instead a means of showing intent for those constitutional torts where
intent matters, and excessive force under the fourth amendment is not one of
those constitutional torts. Proof of failure to train officers could be used to
demonstrate that the municipality approves (hence has a policy of) improper
conduct that training could extirpate. Such a claim in a case like this would
depend on establishing that the City's policymakers knew that the police were
using objectively unreasonable force in apprehending suspects, yet did nothing to
solve the problem. [The plaintiff] has not offered any evidence that use of
excessive force is common in [the city], indeed has not produced evidence of
even one prior incident.

*Id.* at 298-99.

The facts in this case are similar to those in *Dye*.  Here, there is no evidence that excessive force, or even use of force, is common in Genoa.  In fact, the only testimony is that it is rare.  While plaintiff points to Chief Lynch's testimony that he does not investigate incidents with civil litigation potential, he has not proffered any evidence that Chief Lynch was on notice, prior to this incident, that his officers were engaging in excessive force.  Moreover, it is unknown whether and to what extent there are other cases that Chief Lynch did not investigate due to the potential for litigation.  As such, Chief Lynch's failure to supervise or discipline his officers does not raise an inference of deliberate indifference because there is no evidence that he was subjectively aware of a problem in need of remediation.

Plaintiff's failure to train claims must fail for essentially the same reason.  Plaintiff argues that Genoa does not follow its training program, and points out that the Seventh Circuit has held that "ignoring a policy is the same as having no policy in place in the first place." *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004).  However, while plaintiff points to testimony from Chief Lynch that certain training sessions are offered on an optional basis, Chief Lynch also testified that training is offered regarding use of force.  And again, there was no history of excessive force incidents or complaints that could lead to the requisite mental state for deliberate indifference.  Plaintiff may be correct that Genoa's training program was not ideal, but he has not proffered sufficient evidence to show that the city was "on actual or constructive notice that a particular omission in [its] training program causes city employees to violate citizens' constitutional rights,"*see Connick*, 563 U.S. at 61-62, particularly where plaintiff "has not offered any evidence that use of excessive force is common" in Genoa.  *Dye*, 253 F.3d at 299.

Because plaintiff has failed to raise a genuine issue of fact as to whether Genoa was deliberately indifferent with regard to training, supervising, and disciplining its officers to prevent excessive force, Genoa's motion for summary judgment as to the remainder of Counts VI, VII, and VIII is granted.

5. First Amendment Retaliation Claims against Genoa and Mayor Walker (Count XI).

Finally, plaintiff alleges § 1983 first amendment retaliation against Mayor Walker and Genoa (Count XI).  Plaintiff contends that Mayor Walker, and by extension Genoa, retaliated against him for filing the instant lawsuit by seeking to dissuade the state's attorney's office from engaging in plea discussions or otherwise dismissing charges in plaintiff's criminal case, particularly with regard to the aggravated assault against a police officer charge against Officer Lopez.

The Seventh Circuit has noted that  "[t]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."  *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012).  The Seventh Circuit in *Woodruff v. Mason*, 542 F.3d 545 (7th Cir. 2008) set forth the applicable standard:
> To establish a prima facie case of First Amendment retaliation, [the plaintiff]
> must establish that (1) it engaged in activity protected by the First Amendment,

> (2) it suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was ... "at least a motivating factor" in the Defendants' decision to take the retaliatory action.

*Id.* at 551. If the plaintiff makes a prima facie showing, "the burden shifts to the defendant to show that the harm would have occurred anyway." *Thayer*, 705 F.3d at 251-52. If the defendant is successful in doing so, the plaintiff's claim fails. See *Hartman v. Moore*, 547 U.S. 250, 260 (2006) ("It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway.").

With regard to the prima facie case, there is no dispute that plaintiff has satisfied the first element; filing the instant lawsuit was protected activity. "The First Amendment right to petition the government for the redress of grievances extends to the courts in general and applies to litigation in particular." *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008).

With regard to the second element, the Seventh Circuit has held that "for retaliation for filing petitions to be actionable, the means of retaliation must be sufficiently clear and emphatic to deter a person of 'ordinary firmness' from submitting such petitions in the future." *Hughes v. Scott*, 816 F.3d 955, 956 (7th Cir. 2016). On the other hand, even where "[t]he effect on freedom of speech may be small . . . since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Surita v. Hyde*, 665 F.3d 860, 879 (7th Cir. 2011). Here, plaintiff points to the fact that Mayor Walker used the official power and influence of Genoa to ensure that the criminal charges against him would not be dismissed, thus forcing plaintiff to undergo the expense and mental anguish inherent in defending himself at trial. There is at least a genuine issue of fact as to whether a person of "ordinary firmness" would be deterred in similar circumstances from filing a civil lawsuit while criminal charges are pending.

Finally, with regard to the third element, plaintiff "must show a causal link between the protected act and the alleged retaliation. [The plaintiff] does not need to show that [his] litigation history was the only factor that motivated the defendants but it must show that it was a motivating factor. Plaintiff has proffered sufficient circumstantial evidence to raise a genuine issue of fact as to whether his lawsuit was a "motivating factor" in Mayor Walker's decision to send the letter to the state's attorney's office. For example, plaintiff notes that the letter was not sent until after this lawsuit was filed; he also argues that Mayor Walker's proffered reason for the letter, that the state's attorney's office was not communicating with the Genoa police department, is contradicted by Chief Lynch's testimony that there was no such communication problem. Moreover, plaintiff points out that Mayor Walker had a retaliatory motive, namely to discredit an individual who was seeking legal redress against Genoa. As such, the court finds that there is a genuine issue of fact as to whether plaintiff has made a prima facie case of first amendment retaliation.

Defendants argue that plaintiff's retaliation claim must be examined under the framework of a retaliatory prosecution claim. They point to cases where the defendants, public officials,

were alleged to have induced prosecution against the plaintiffs for engaging in protected speech. *See Hartman v. Moore*, 547 U.S. 250 (2006); *Peals v. Terre Haute Police Dept.*, 535 F.3d 621 (7th Cir. 2008). These cases stand for the proposition that even where a plaintiff sets forth a prima facie case of first amendment retaliation in the form of inducement to prosecute, to succeed on causation grounds he must also show that there was no probable cause to support the prosecution. This is because the presence of probable cause "provides strong evidence that he would have been [prosecuted] regardless of any illegitimate animus." *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012); *Hartman v. Moore*, 547 U.S. 250, 260 (2006) ("Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution, while establishing the existence of probable cause will suggest that prosecution would have occurred even without a retaliatory motive.").

The Supreme Court in *Hartman* noted that in a retaliatory prosecution claim, the defendant will not be the prosecutor, who is immune, but rather "will be a nonprosecutor, an official . . . who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute." *Hartman*, 547 U.S. at 260. "Thus, the causal connection required here is not merely between the retaliatory animus of one person and that person's own injurious action, but between the retaliatory animus of one person and the action of another." *Id.* at 262. Recognizing "the factual difficulty of divining the influence of [a non-prosecutor] upon the prosecutor's mind, [as well as] an added legal obstacle in the longstanding presumption of regularity accorded to prosecutorial decisionmaking," the Court found that proving "the absence of probable cause" would be "needed both to bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action, and to address the presumption of prosecutorial regularity." *Id.* at 263. The Court noted that while " [a] prosecutor's disclosure of retaliatory thinking on his part" or "evidence that a prosecutor was nothing but a rubber stamp," would "be of great significance in addressing the presumption and closing the gap," in reality "these examples are likely to be rare and consequently poor guides in structuring a cause of action." *Id.* at 264. As such, the Court concluded that:

> [A] retaliatory motive on the part of an official urging prosecution combined with an absence of probable cause supporting the prosecutor's decision to go forward are reasonable grounds to suspend the presumption of regularity behind the charging decision, and enough for a prima facie inference that the unconstitutionally motivated inducement infected the prosecutor's decision to bring the charge.

*Id.* at 265.

Plaintiff argues that the cited retaliatory prosecution cases are irrelevant to this case, because he is not claiming that Mayor Walker induced the initiation of prosecution against him. Rather, he is claiming that Mayor Walker used his influence to keep the prosecutors from dismissing charges that they had already brought. The court acknowledges that plaintiff's claim is not technically a retaliatory prosecution case per se; plaintiff may be correct that despite his lack of admissible evidence that the prosecution was considering or would have dismissed any of

the charges, the Mayor's mere act of using the official authority of the city to influence the direction of an ongoing criminal prosecution was sufficient for a person of ordinary firmness to avoid seeking redress against the city. On the other hand, an examination of the Supreme Court's analysis in *Hartman* reveals that many of the same evidentiary and causation issues are at issue. Like a retaliatory prosecution case, it is difficult "to divine" Mayor Walker's use of influence over the state's attorney's office without some smoking gun that the prosecutors shared Mayor Walker's retaliatory animus or were otherwise a rubber stamp for the wishes of Genoa. Therefore, the court agrees with defendants that this case is in many significant respects analogous to the retaliatory prosecution cases examined above.

Ultimately, the court need not resolve the issue, because plaintiff's claim may proceed even if the court accepts that plaintiff must present evidence as to the absence of probable cause. The analysis here is distinct from the analysis of plaintiff's false arrest claims, where probable cause for the domestic battery charge was sufficient to defeat the claim. As relevant to plaintiff's retaliation claim, Mayor Walker specifically requested that the aggravated assault against a police officer charge, which doubtless carried the potential for punishment above and beyond the domestic battery charge, not be dismissed. Thus, the relevant question here is whether probable cause existed for the aggravated assault charge. And as the court has previously noted, plaintiff has raised a genuine issue of material fact on this issue. According to plaintiff, Officer Lopez had no basis to believe plaintiff was threatening him, and thus there was no probable cause to charge him with aggravated assault against a police officer. Taking all inferences in favor of plaintiff, the only reason to do so would be to cover up Officer Lopez's alleged use of excessive force. Thus, the court is satisfied that plaintiff has raised a genuine issue of fact with regard to his first amendment retaliation claim.

For the foregoing reasons, defendants' motion for summary judgment with regard to Count XI is denied.

C. Officer Lopez's motion to bifurcate.

Officer Lopez argues that the court should bifurcate his trial with that of Genoa and Mayor Walker. Officer Lopez argues that plaintiff will seek to introduce evidence regarding Officer Lopez's 30-day suspension for endangering a minor in support of plaintiff's failure to screen claim. Officer Lopez points out that this evidence, which could potentially be relevant to Genoa's failure to screen claim, would be unduly prejudicial and inadmissible as to plaintiff's claims against him, including excessive force and malicious prosecution. Plaintiff responds that numerous factors weigh against bifurcation, the risk of prejudice is slight, and that in any case the evidence is admissible under Federal Rule of Evidence 404.

Officer Lopez's arguments are now moot because the court has granted Genoa's motion for summary judgment with regard to plaintiff's failure to screen claim, thus eliminating plaintiff's ability to admit the evidence as proof of that claim. Officer Lopez's disciplinary history will not be admissible as part of plaintiff's case against either him or Genoa unless plaintiff is correct that it is admissible for some other purpose, such as Rule 404. As such, the

potential prejudice Officer Lopez points to is no longer an issue in the case and his motion to bifurcate [160] is denied.

For the foregoing reasons, Officer Lopez's motion for summary judgment [130] is granted. Count IX is dismissed. Genoa and Mayor Walker's motion for summary judgment [129] is granted in part and denied in part. Counts VI, VII, and VIII are dismissed. Those counts that were not challenged or that survived summary judgment are Counts I, II, III, IV, V, X, XI, XII, and XIII. Officer Lopez's motion to bifurcate [160] is denied. This case is set for a status hearing before this court on October 14, 2016 at 10:30 a.m.

Date: 10/07/2016                          ENTER:

_Philip G. Reinhard_
_____
United States District Court Judge

Electronic Notices. (LC)